

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

December 10, 2024

**BY ECF**

The Honorable Loretta A. Preska
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:   *United States v. Shukratjon Mirsaidov*
              No. 22 Cr. 614 (LAP)

Dear Judge Preska:

      Shukhratjon Mirsaidov is scheduled to be sentenced on December 17, 2024, at 2 p.m., having pled guilty to conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h). The parties stipulated in a plea agreement to a United States Sentencing Guidelines ("Guidelines") range of 37 to 46 months' imprisonment (the "Stipulated Guidelines Range"). For the reasons set forth below, the Government recommends a sentence at the bottom of the Stipulated Guidelines Range as a sentence that is sufficient but not greater than necessary to satisfy the goals of sentencing.

    **A. Offense Conduct**

      Between 2019 and 2022, Mirsaidov conspired to launder hundreds of thousands of dollars in healthcare fraud proceeds using the bank account of the U.S. subsidiary of an international airline ("Airline-1") where he was the top U.S. executive. (PSR ¶¶ 12, 13). Mirsaidov conspired with co-defendant Abdullaev to execute the scheme. (PSR ¶ 13). Abdullaev, who was not an employee of Airline-1, acquired checks from various shell companies involved in a healthcare fraud scheme, and he partnered with Mirsaidov to deposit those checks into the bank account of Airline-1. (PSR ¶ 13). As the top executive of Airline-1's U.S. subsidiary, Mirsaidov was one of two signatories for Airline-1's U.S. bank account, which Mirsaidov and Abdullaev used for the money laundering conspiracy. (PSR ¶¶ 13, 14). Abdullaev and Mirsaidov collected cash from airline ticket sales and fees, and Abdullaev provided that cash in exchange for the checks, minus a fee, to the individuals providing the checks. (PSR ¶¶ 13, 35). Mirsaidov is responsible for laundering $674,171 through Airline-1's bank account, as reflected in the agreed forfeiture amount.

      Abdullaev provided over 100 checks to Mirsaidov from a series of related shell companies with no relation to the airline industry, which Mirsaidov then deposited into Airline-1's bank

account. (PSR ¶¶ 14, 15). The shell companies were primarily funded by payments from companies in the medical industry, such as medical clinics, diagnostics companies, and physicians, that were engaged in healthcare fraud. (PSR ¶ 16). For example, five of these companies received over 35 check deposits totaling approximately $260,000 from a Manhattan-based physician ("Doctor-1") engaged in a fraudulent billing scheme. (PSR ¶¶ 15, 16). As part of the scheme, insurance providers were falsely billed for medical services purportedly rendered by Doctor-1 but which Doctor-1 in fact did not provide. (PSR ¶¶ 16-17). Over $1 million in fraudulent claims was submitted to insurance providers on behalf of Doctor-1.[1]

Law enforcement uncovered the operations of Mirsaidov and Abdullaev's money laundering conspiracy in part through a series of sting transactions. The sting operation began when, in April 2021, a confidential source ("CS-1") observed Abdullaev at JFK International Airport hand multiple checks to an employee of Airline-1. (PSR ¶ 20). Abdullaev told CS-1 that Abdullaev was engaged in money remitting, using funds obtained from Airline-1. (PSR ¶ 20).

Between June 2021 and February 2022, Abdullaev agreed to cash checks for CS-1, who was acting at the direction of the FBI. (PSR ¶ 19). CS-1 agreed to pay Abdullaev a four percent fee for each transaction. (PSR ¶ 19). Overall, CS-1 provided Abdullaev 14 checks totaling $210,000. (PSR ¶ 19). The checks were issued from an FBI covert bank account held in the name of a fictitious company ("Sham Company-1"). (PSR ¶ 19). All but two of the checks, worth $30,000, were deposited into the Airline-1 bank account. (PSR ¶ 19). CS-1 received cash from Abdullaev in exchange for these checks. (PSR ¶¶ 23, 25, 27, 29).

Evidence collected during the sting operation showed that Mirsaidov and Abdullaev worked together closely to execute the check cashing and money laundering scheme. As noted above, all but two of the fourteen checks from Sham Company-1 were deposited into the Airline-1 bank account. (PSR ¶ 19). Toll records show Mirsaidov and Abdullaev were in frequent contact and consistently communicated on dates that checks from Sham Company-1 were deposited into the Airline-1 bank account. ((PSR ¶ 31). In executing one sting transaction, Abdullaev directed CS-1 to deliver the checks to Mirsaidov at Airline-1's office, and Abdullaev stated he would inform Mirsaidov that CS-1 was coming. (PSR ¶ 28). Once at the office, CS-1 handed the checks in an envelope to an Airline-1 employee and requested the envelope be provided to Mirsaidov; the check was subsequently deposited into the Airline-1 bank account, indicating Mirsaidov had received and deposited the checks. (PSR ¶ 28). During another transaction, Abdullaev delivered $33,700 in cash to CS-1 in a re-used box with a shipping label addressed to Mirsaidov's home address, indicating Mirsaidov had given the cash to Abdullaev in exchange for the checks. (PSR ¶ 29). During a later recorded conversation, Abdullaev described Mirsaidov as the "chief person" with whom Abdullaev worked at Airline-1, and in multiple conversations claimed that he gave Mirsaidov a portion of the check cashing fee. (PSR ¶¶ 30, 36). For example, in one recorded conversation, Abdullaev told CS-1 that he gave 1.5% to Mirsaidov as Mirsaidov's portion of the

---

[1] The Presentence Report states that over $350,000 in fraudulent claims was submitted to insurance providers on behalf of Doctor-1 (PSR ¶ 17), which was information taken from the criminal complaint in this case. Insurance records obtained since the complaint was filed show over $1 million in fraudulent claims were submitted to insurance providers on behalf of Doctor-1.

fee. (PSR ¶ 30). In another recorded conversation, Abdullaev told CS-1 that Airline-1 took its share during the transaction. (PSR ¶ 22).

Other recorded conversations with Mirsaidov demonstrated that Mirsaidov and Abdullaev worked hand-in-hand to execute the money laundering scheme using Airline-1's bank account. For example, in July 2021, CS-1 met with Mirsaidov to discuss the possibility of cashing checks directly with Mirsaidov, without Abdullaev's involvement. (PSR ¶ 32). In response, Mirsaidov explained that Abdullaev brought him numerous checks for "tickets" and that Mirsaidov provided cash in exchange. (PSR ¶¶ 32, 33). Mirsaidov prefaced his explanation by stating "just so you understand our payment arrangements." (PSR ¶ 32). In the context of discussing whether CS-1 could work with Mirsaidov directly to cash checks, Mirsaidov explained that "our" turnover is $50,000 to $60,000 per month, meaning Airline-1 had $50,000 to $60,000 in cash available for check cashing per month. (PSR ¶ 34).

During this same conversation with CS-1, Mirsaidov expressed no hesitation regarding the source of the checks from Abdullaev or CS-1. For example, Mirsaidov stated that he did not know to whom the checks from Abullaev belonged, but Mirsaidov nevertheless deposited the checks and gave cash from ticket sales in exchange for the checks from Abdullaev. (PSR ¶ 32). In addition, Mirsaidov told CS-1 he was willing to consider working directly with CS-1 to engage in check cashing despite CS-1's representation that CS-1's checks were from a medical company and that CS-1's company concealed the true nature of the check deposits by reflecting they were for the purchase of business class tickets. (PSR ¶¶ 33, 34).

Mirsaidov again acknowledged the check cashing scheme with Abdullaev and his willingness to work with others to engage in check cashing in another recorded conversation. Specifically, during a meeting on February 15, 2022, between Mirsaidov and an undercover (the "UC") acting as CS-1's boss, Mirsaidov acknowledged that he received numerous checks from Abdullaev. (PSR ¶ 38). Mirsaidov further expressed that he would "like" to work directly with the UC in check cashing, as the UC had proposed, and that it was "good" that the UC wanted to work directly with Mirsaidov. (PSR ¶ 39). But, Mirsaidov disclosed to the UC that he was departing the United States imminently because Airline-1 had reassigned him to another location. (PSR ¶ 39). This information prompted law enforcement to arrest Abdullaev and Mirsaidov within days. (PSR ¶ 40).

### B. Procedural History

Mirsaidov was arrested pursuant to a criminal complaint on February 18, 2022. On November 9, 2022, a grand jury returned an indictment charging Mirsaidov and his co-defendant Abdullaev. Mirsaidov was charged with conspiracy to operate an unlicensed money transmitting business, operation of an unlicensed money transmitting business, and conspiracy to commit money laundering. On May 30, 2024, Mirsaidov pled guilty pursuant to a plea agreement to conspiracy to commit money laundering. In the plea agreement, the parties stipulated that the applicable Guidelines range is 37 to 46 months' imprisonment. On August 21, 2024, the United States Probation Office issued the presentence report in this case, which likewise calculated a Guideline range of 37 to 46 months' imprisonment. (PSR ¶ 96). The Probation Office recommends

a sentence of 30 months' imprisonment. (PSR at 28). On December 3, 2024, the defendant filed a sentencing submission requesting a sentence of probation. (Def. Sub. at 1).

Co-defendant Abdullaev pled guilty on November 16, 2024, to conspiracy to commit money laundering. The Court sentenced Abdullaev to 24 months of imprisonment.

On October 17, 2024, Kenan Tariverdi, Nazim Tariverdi, Dilshod Islamov, and Alvaro Geovanni Quijada-Lemus were arrested pursuant to an indictment in *United States v. Tariverdi, et al.*, No. 24 Cr. 599 (JPO), charging them with various wire fraud, healthcare fraud, and money laundering conspiracy conspiracy charges. As alleged in the indictment, Kenan Tariverdi, Nazim Tariverdi, and Dilshod Islamov operated a no-fault insurance fraud scheme in which they defrauded insurance companies of at least $10 million. They laundered their crime proceeds using shell companies and cashing the checks from the shell companies using various money launderers. Alvaro Geovanni Quijada-Lemus was one of those money launderers. Abdullaev and Mirsaidov were other money launderers who cashed checks for Kenan Tariverdi, Nazim Tariverdi, and Dilshos Islamov. The illegal check cashing that Abdullaev and Mirsaidov conducted for Kenan Tariverdi, Nazim Tariverdi, and Dilshod Islamov is the basis for the money laundering charge to which Abdullaev and Mirsaidov pled guilty.

**C. Discussion**

**1. Applicable Law**

As the Court knows, the Sentencing Guidelines, while no longer mandatory, still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), courts must treat them as the "starting point and the initial benchmark" for sentencing proceedings, *id.* at 49.

After calculating the Guidelines range, the Court must consider the factors outlined in Title 18, United States Code, Section 3553(a), which include: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall v. United States*, 552 U.S. 32, 50 & n.6 (2007).

In determining the appropriate sentence, the statute directs the Court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and

(D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### 2. A Sentence at the Bottom of the Stipulated Guidelines Range Is Warranted

A sentence at the bottom of the Stipulated Guidelines Range of 37 to 46 months' imprisonment is sufficient, but not greater than necessary, to comply with the purposes of sentencing. The most important sentencing factors in this case are the need to reflect the seriousness of the defendant's offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence to this defendant and other similarly situated individuals. *See* 18 U.S.C. § 3553(a)(2)(A)-(C). These factors, considered in light of co-defendant Abdullaev's below-Guidelines sentence, weigh in favor of a sentence at the bottom of the Stipulated Guidelines Range. In addition, for the reason describe below, the Court should not impose a term of supervised release.

*a. The Seriousness of the Offense and Mirsaidov's Role Warrants a Sentence at the Bottom of the Guidelines Range*

Mirsaidov's crime was serious. Mirsaidov participated in a complex money laundering scheme for approximately two years in which he personally laundered at least $670,000 in healthcare fraud proceeds. Mirsaidov abused his position as an executive at Airline-1 and his access to Airline-1's bank account to execute this money laundering scheme. Mirsaidov conspired with Abdullaev to execute the scheme, and he turned a blind eye to the source of the checks, despite obvious red flags that the checks and the purpose of the check cashing transactions was illicit. Mirsaidov played a key role in the money laundering scheme by granting Abdullaev—and by proxy the co-conspirators engaged in the healthcare fraud—access to Airline-1's bank account to conceal their fraud proceeds amongst the legitimate business transactions of Airline-1. Although Mirsaidov had no role in the underlying healthcare fraud, the money laundering transactions he completed played an important role in facilitating the underlying fraud by helping the perpetrators of the fraud conceal their crime proceeds and turn them into non-traceable cash. Mirsaidov was motivated by financial gain to commit these crimes, taking a financial cut for each transaction he completed.

In his sentencing submission, the defendant makes various arguments to minimize the seriousness of the offense and his role in it.[2] First, the defendant argues that the fact that the check

---

[2] In his sentencing submission, the defendant makes two arguments regarding the Guidelines calculation, specifically regarding the loss amount and the defendant's purported minor role. (Def. Sub. at 5-14). The Government has clarified with defense counsel that the defendant does not dispute the Guidelines Range stipulated in the parties' plea agreement and does not seek a different Guidelines Range calculation. Defense counsel confirmed that the defendant instead makes these arguments in support of a sentence below the Stipulated Guidelines Range pursuant to 18 U.S.C. § 3553(a). In addition, in his sentencing submission, the defendant requests a *Fatico* hearing if the Government disputes Mirsaidov's role in the conspiracy. (Def. Sub. at 14). The Government has

cashing transactions were associated with the actual sale of airline tickets is a mitigating factor. This is not a mitigating factor but instead a core component of the scheme. The perpetrators of the healthcare scheme sought cash in exchange for the checks and wanted to conceal their fraud proceeds by making the check deposits appear to be legitimate business transactions. The fact that Airline-1 generated significant amounts of cash from the sale of airline tickets and fees is what made Airline-1 a viable option for this money laundering scheme. The cash produced from the ticket sales and fees was essential to the completion of the scheme, for without it, Mirsaidov and Abdullaev could not cash the checks for the healthcare fraud conspirators. Moreover, the volume of funds Mirsaidov and Abdullaev could launder through Airline-1—and thus their own profits from the check cashing—depended on Airline-1 selling a high volume of airline tickets for cash. For these reasons, the fact that Mirsaidov sold airline tickets to fund the check cashing transactions is an aggravating, not mitigating, factor.

Second, the defendant claims that his role in the conspiracy was minimal, that he "did not exercise any decision-making authority", and that he had no knowledge of the underlying healthcare fraud.[3] The defendant's role in the conspiracy was not minimal and could not have "been performed by anyone with access to a bank account", as the defendant insists. As described above, the defendant held a key role in the money laundering scheme because he gave Abdullaev, and by proxy the others engaged in the healthcare fraud, access to Airline-1's bank account to use it for money laundering. Not any bank account would have worked to execute the scheme. The scheme required a legitimate business that generated a significant volume of cash so that (1) checks could be deposited without raising the suspicions of banks or law enforcement, and (2) cash, that was otherwise untraceable, could be provided in exchange for the checks. Moreover, the defendant did have "decision-making authority" because, as the executive with oversight of Airline-1's bank account, he authorized all the check cashing transactions and executed the check deposits into Airline-1's account. Although the Government has no evidence that the defendant had specific knowledge of the healthcare fraud or the co-conspirators engaged in that fraud, the defendant should not receive mitigation for purposefully turning a blind eye to the source of the checks. As described above, the defendant expressed a willingness to work directly with the CS and the UC to engage in check cashing and was indifferent to the source of their checks.

Lastly, the defendant seeks to portray his role as less culpable than Abdullaev's role and claims that he took direction from Abdullaev. Mirsaidov did not work for Abdullaev in the scheme nor was he supervised by him. Mirsaidov and Abdullaev played different roles in the conspiracy, and Mirsaidov was at least equally culpable to Abdullaev. Abdullaev was the go-between Mirsaidov and the perpetrators of the healthcare fraud and negotiated the check cashing transactions with the perpetrators of the healthcare fraud. But Mirsaidov was the gatekeeper to

---

confirmed with defense counsel that there are no factual disputes, and thus no *Fatico* is necessary, although the parties have different views regarding the significance of Mirsaidov's role in the crime given the undisputed facts. The Government understands that defense counsel will file a supplemental letter clarifying the defendant's position on these issues.

[3] The Government has clarified with defense counsel that the defendant does not dispute that he understood at the time of the conspiracy that the checks were crime proceeds of some kind, consistent with his guilty plea allocution.

both Airline-1's bank account and the cash generated from the sale of airline tickets. This is corroborated by the fact that Abdullaev was not able to execute check cashing transactions using the Airline-1 bank account when Mirsaidov was away traveling. (PSR ¶ 24, 25). Indeed, Abdullaev in recorded conversations referred to Mirsaidov as "the boss". (PSR ¶ 24). It was Mirsaidov who was the corporate executive at Airline-1, while Abdullaev was a cook not even employed at Airline-1. Thus, an aggravating factor unique to Mirsaidov was his manipulation of his position of authority at Airline-1 to perpetrate the money laundering scheme.

> b. *The Need for Specific and General Deterrence Warrants a Sentence at the Bottom of the Guidelines Range*

There is a need for specific deterrence. Mirsaidov's participation in money laundering was not a momentary lapse in judgment. He facilitated the money laundering scheme for approximately two years, repeatedly executing transactions and depositing over 100 checks into Airline-1's bank account. For personal financial profit, Mirsaidov was willing to abuse his position of authority at Airline-1. Mirsaidov expressed a willingness to engage in check cashing with CS-1 and the UC, demonstrating that Mirsaidov was willing to engage in the illegal conduct with others, not only with Abdullaev. Nor was Mirsaidov deterred from crime despite his longtime legitimate employment at Airline-1, and despite knowing his responsibilities to his wife and children. Thus, despite multiple disincentives, Mirsaidov, motivated by financial gain, engaged in money laundering over an extended period, indicating specific deterrence is warranted.

General deterrence is a significant factor in this case. Mirsaidov's crime was deliberate, motivated by a desire for financial gain, and carried out using sophisticated mechanisms that made it difficult to detect. These factors all counsel in favor of a more significant sentence for the sake of general deterrence. *See Harmelin v. Michigan*, 501 U.S. 957, 989 (1991) (noting that crimes that are "significantly more difficult to detect may warrant substantially higher penalties"); *United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.") (quoting *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.)).

This case also has a heightened need for general deterrence. Mirsaidov participated in a loose money laundering network operating primarily in the New York City area but also in other cities in the Northeast. This network, for a fee, both provides illegal check cashing and transmits remittances illegally abroad, primarily to Central Asia, Russia, and Iran. Members of the network tend to use the same or similar methods to execute their check cashing and money transfer schemes, and their illegal check cashing services are largely used by perpetrators of healthcare fraud. The Government has recently prosecuted multiple individuals who participated in or used this network to launder healthcare fraud proceeds or illegally transmit funds, including in *United States v. Rasulov, et al.* SDNY, No. 20 Cr. 653 (RA), *United States v. Sharipov*, SDNY, No. 23 Cr. 245 (JPC), *United States v. Rakhmanova*, SDNY, No. 22 Cr. 114 (RA), *United States v. Ilyayev, et. al.*, SDNY No. 23 Cr. 506 (GHW), *United States v. Rahmatov*, SDNY No. 22 Cr. 268 (MKV), *United States v. Tariverdi, et al.*, SDNY No. 24 Cr. 599 (JPO), and *United States v. Khaim, et al.*, EDNY No. 20 Cr. 580 (AMD). The Government actively continues to investigate other members

of the network, which continues to launder healthcare fraud and other crime proceeds. A substantial sentence is warranted to send a message to others who may consider participating in this money laundering network that their crime will be met with serious repercussions.

    *c. The Court Should Not Impose a Term of Supervised Release*

The Court should not impose a term of supervised release. Supervised release would not be appropriate here because, as a non-U.S. citizen convicted of a deportable offense, Mirsaidov will be removed from the United States after completing his sentence, and he cannot be effectively supervised in immigration custody or abroad. Pursuant to U.S.S.G. §5D1.1(c), the Court "ordinarily should not impose a term of supervised release in a case in which supervised release is not required by statute and the defendant is a deportable alien who is likely to be deported after serving a term of imprisonment." Indeed, there would be no practical enforcement mechanism of such a term of supervised release. *See United States v. Ahmad*, No. 05 Cr. 00019-DC, 2021 WL 3550229, at *2. (S.D.N.Y. Aug. 10, 2021) (noting that if defendant "were released, he would be deported to Afghanistan, where he could resume his criminal operations without supervision from this Court." (citing *United States v. MacCallum*, No. 1:15-CR-00204 (EAW), 2021 WL 28016, at *7 (W.D.N.Y. Jan. 5, 2021) (acknowledging that if defendant was released and deported, it would be impossible to enforce any supervised release program))).

The Court should be aware that if the Court imposes a term of supervised release, the defendant will under the First Step Act receive Earned Time Credit—time credits in addition to Good Conduct Time the defendant will earn assuming good behavior—and the sentence he serves will be substantially shorter than the sentence imposed. In addition to Good Conduct Time, eligible defendants, such as this defendant, can accrue up to 15 days of Earned Time Credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities. *See* 18 U.S.C. § 3632(d)(4)(A)(i)–(ii). In other words, the defendant would be eligible to earn 15 days per month of credit toward "prerelease custody or supervised release." 18 U.S.C. § 3236(d)(4)(C). Eligible prisoners are automatically enrolled in the program. Temporary operational or programmatic interruptions authorized by the BOP will not ordinarily affect an eligible inmate's "successful participation[.]"28 C.F.R. § 523.41(c)(3). Up to twelve months of Earned Time Credits may be used to reduce a defendant's sentence. *See* 18 U.S.C. § 3624(g)(3). After earning a year off one's sentence, the remaining Earned Time Credits "shall be applied toward time in prerelease custody[,]" such as a residential reentry center ("RRC") (also referred to as a hallway house) or home confinement. 18 U.S.C. § 3632(d)(4)(C).

Imposing supervised release here would be an end-run around congressional policy under the FSA, which "explicitly prohibits prisoners who are subject to a final order of removal from applying time credits to early release." Order, *United States v. Bevz*, 21 Cr. 618 (NRB), Dkt. No. 40 (S.D.N.Y. Dec. 27, 2023) (citing 18 U.S.C. § 3632(d)(4)(E)). As observed by another court in this District rejecting nominal supervised release to a deportable defendant seeking FSA credit, "[t]he FSA denies all prisoners in [defendant's] position credit towards early release. His circumstance reflects the ordinary functioning of congressional policy." *United States v. Herrera*, No. 21-CR-750 (LJL), 2023 WL 3862695, at *3 (S.D.N.Y. June 7, 2023). And although Mirsaidov, like the defendant in *Bevz*, "is not yet subject to a final order of removal, he correctly

acknowledges" the likelihood of his deportation. Bevz, 21 Cr. 618 (NRB), Dkt. No. 40 at 3 (internal quotations omitted); *see* Def Sub. at 3 (noting the defendant "faces the possibility of being deported from the U.S. since he is not a U.S. citizen".) The Court should not bypass the FSA's exclusions with a meaningless supervised release term.

Courts in this district have rejected attempts by deportable defendants to add token terms of supervised release to their sentence to attempt to qualify for FSA credit. *See, e.g.*, *Bevz,* 21 Cr. 618 (NRB), Dkt. No. 40 (denying application to impose supervised release on deportable defendant, not yet subject to final removal order); *Herrera*, 2023 WL 3862695, at *3 ("[U]nder the FSA, prisoners who are subject to final orders of deportation are not eligible to apply the time credits to early release . . . . The application of the FSA to Mr. Herrera does not constitute an 'extraordinary or compelling' reason for compassionate release."); *United States v. Tyurin*, 15 Cr. 333 (LTS), Dkt. No. 299 (S.D.N.Y. July 27, 2024) (denying request to add term of supervised release and observing that "Mr. Tyurin's circumstances are those that Congress intended—indeed, the FSA's ineligibility criteria apply to all incarcerated persons in his position—and thus are not 'extraordinary and compelling.'"). Likewise, the Court should not impose a term of supervised release here where the defendant has been convicted of a deportable defense but is not yet subject to an order of removal.

### d. The Personal Mitigating Factors Cited by the Defendant Do Not Warrant a Below-Guidelines Sentence

The defendant also argues for a non-custodial sentence based on various personal mitigating factors, such as his family's reliance on his financial support and his positive role in his immediate community, as described in letters by his friends, families, and work associates. While the Court should consider these mitigating factors, and the Government recommends a bottom of the Guidelines sentence in part based on those factors, Mirsaidov does not point to anything so extraordinary in his background or character as to justify a non-custodial sentence. The attestations to Mirsaidov's personal qualities do not distinguish him from other similar situated white-collar defendants—individuals who, despite having many opportunities and a network of people who love and support them, choose to engage in financial crime. As Judge Marrero astutely observed, this collection of letters

> falls into a pattern advanced by a subset of the white collar criminal. . . . The list of their achievements and virtues is long and impressive. Let us count the ways. At home, they are good family men and women, caring spouses, loving parents, loyal and reliable to friends. At work, they are looked up to as outstanding professionals and business partners. To their community's charities and public causes they are generous patrons and sponsors.

*United States v. Regensberg*, 635 F. Supp. 2d 306, 308 (S.D.N.Y. 2009), *aff'd*, 381 F. App'x 60 (2d Cir. 2010). Mirsaidov's commitment to his family, friends, customers and work colleagues while commendable, is by no means atypical for an educated white-collar offender and does not warrant a downward variance. Moreover, the defendant is the sole person responsible for the collateral consequences of his crime for his family.

Ultimately, the aggravating factors in this case, particularly the seriousness of the crime, the duration and scope of the crime, and Mirsaidov's abuse of his position of authority, outweigh the mitigating factors in this case and signal that a substantial sentence of imprisonment is necessary. Thus, to deter the defendant and other similarly situated defendants from future crimes, and to respond to the seriousness of his crime with an appropriate punishment, a sentence at the bottom of the Stipulated Guidelines Range of 37 to 46 months' imprisonment is appropriate.

Sincerely,

DAMIAN WILLIAMS
United States Attorney

by: _____
Christopher D. Brumwell
Cecilia Vogel
Assistant United States Attorney
(212) 637-2477/1084

cc:  Igor Niman, Esq. (via ECF)